UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNIBEST INTERNATIONAL LLC,<br><br>               Plaintiff,<br><br>     v.<br><br>WINFIELD SOLUTIONS LLC,<br><br>               Defendant. | No. 4:16-CV-5031-EFS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Before the Court is Defendant Winfield Solutions' Motion for Summary Judgment, ECF No. 25. A hearing was held on this matter on October 25, 2017. *See* ECF No. 56. This Order memorializes and further develops the Court's oral rulings made at the hearing. After reviewing the record, relevant authority, and arguments from counsel for both parties, the Court is fully informed. For the reasons set forth below, the Court grants Winfield's motion in part and denies it in part.

## I. FACTUAL HISTORY[1]

Plaintiff Unibest International LLC ("Unibest") is a small agricultural products company based out of Walla Walla, Washington. *See* ECF No. 41 at 2. Unibest develops soil and crop monitoring products designed to "improve crop yields, enhance sustainability, optimize nutrient application timing, and minimize environmental impact." ECF No. 39 at 2. Among other things, Unibest manufactures

---

[1] The facts are only briefly summarized. Detailed facts are contained in the parties' briefing, statements of undisputed material facts, and responses to both. *See, e.g.*, ECF Nos. 26 & 41.

ORDER - 1

resin capsules under the trade name "Ag Manager," which "act[] like a synthetic plant root" and allow crop producers to "determine the amount and type of nutrients a plant is absorbing from the soil." *Id*. Defendant Winfield Solutions, LLC ("Winfield") is a Delaware limited liability company that is owned in part by Land O'Lakes, Inc., a large Minnesota corporation. *See* ECF No. 26 at 1. Winfield is "in the business of manufacturing and distributing soil-monitoring products." *See* ECF No. 28 at 2.

This dispute arises from a "Manufacturer and Distributor Agreement" between Unibest and Winfield, which they entered into on February 18, 2013. *See* ECF No. 28, Exhibit A ("Agreement"). The Agreement provides that Winfield would have the exclusive rights to market and distribute Unibest's resin capsule products. *See* Agreement at 1. In return, Winfield agreed to purchase more than a certain annually-increasing number of the resin capsules – the "Minimum Annual Purchase Quantity" ("MAPQ"). In practice, this obligated Winfield to purchase at least 60,000 capsules in 2013, at least 80,000 in 2014, and increasing quantities in the following years. *See* Agreement at 3.

The Agreement also obligated Winfield to "work with [Unibest] to develop a marketing strategy" for the resin capsules and to use "commercially reasonable efforts to sell and promote" Unibest's products. Agreement at 1–2. To that end, Winfield was to "develop marketing materials and product packaging" for the resin capsules. Agreement at 2. All marketing materials were to be approved by Unibest before going to the market. *See* Agreement at 2.

/

On June 30, 2014, the parties executed an amendment to the Agreement. *See* ECF No. 28, Exhibit C ("Amendment"). The Amendment made two primary changes to the Agreement: (1) it significantly reduced Winfield's MAPQ obligations from 2014 onward, purportedly because Winfield was struggling to sell the requisite amount of resin capsules; and (2) it permitted the parties to make a subsequent agreement to allow Unibest to sell the products directly to customers. *See* Amendment at 1, 3; ECF No. 26 at 10; ECF No. 50, Exhibit E. It also established a MAPQ payment schedule under which Winfield would pay 50 percent of the MAPQ by February 15 of each year (the "First Product Payment") and the remaining balance of the MAPQ by October 1 of each year (the "Second Product Payment"). *See* Amendment at 2.

To help develop supporting data for the resin capsules, Winfield decided to use them at "Answer Plots" — small fields for demonstrations to potential customers — located throughout the country. *See* ECF No. 41 at 17. In spite of these efforts, Winfield faced significant difficulty in selling Unibest products. *See* ECF No. 50 at 21.

By September of 2015, the relationship between the parties had begun to break down. On September 29, 2015, Unibest delivered to Winfield two invoices: Invoice 2666, for the 2015 Second Product Payment; and 2702, for the "2015 Analysis Reconciliation Payment," another of Winfield's obligations under the Agreement. *See* ECF No. 26 at 12. Winfield paid Invoice 2666, but did not pay Invoice 2702. *See* ECF No. 26 at 13. On January 7, 2016, Unibest CEO Mark Riess sent Winfield Marketing Director Tyler Grenzow a letter requesting payment

of Invoice 2702 plus $13,035.45 of late "service charges" as provided by the Agreement; this letter also included Invoice 2727, for the 2016 First Product Payment. *See* ECF No. 28, Exhibit E. Winfield paid Invoice 2702 plus the requested service charges on January 27, 2016 — 118 days late. *See* ECF No. 28, Exhibit G.

Following Mr. Riess' January 7, 2016 letter, Mr. Grenzow allegedly contacted him to discuss modifying the Agreement to remove Winfield's annual purchase obligations and to transition the Agreement into a research and development partnership. *See* ECF No. 26 at 14. On February 12, 2016, Mr. Riess emailed Mr. Grenzow, "checking to see if [he] had time to catch up." ECF No. 28, Exhibit J. Mr. Grenzow replied: "Yes, let's plan on talking early next week. Also, per our last conversation[,] Winfield will not be taking anymore [sic] physical product under the contract. We have excess inventory that we will be utilizing for research purposes in 2016 season." ECF No. 28, Exhibit J.

In response to Mr. Grenzow's email, Unibest retained counsel and sent him a letter on February 23, 2016. *See* ECF No. 28, Exhibit K. The letter argued Mr. Grenzow's February 12, 2016 email and Winfield's subsequent failure to pay Invoice 2727 — the 2016 First Product Payment — by February 15, 2016, triggered the Agreement's liquidated damages clause in its entirety, entitling Unibest to $927,500 in damages.

The parties dispute the exact amount of the payment and the exact date, but they agree that Winfield eventually made the First Product Payment plus late fees per the Agreement on April 1, 2016. *See*

ECF No. 41 at 39; ECF No. 51 at 10; *see also* ECF No. 28, Exhibit Q. On the same day, Winfield sent a notice "hereby terminating the Agreement, effective sixty (60) days herefrom, pursuant to Section 4(a) of the Agreement." ECF No. 28, Exhibit P.

## II.  **PROCEDURAL HISTORY**

On March 23, 2016, Unibest filed suit in the Eastern District of Washington, alleging Winfield "breached the Agreement by failing to pay invoice 2727 for the First Product Payment by February 15, 2016," and, in doing so, caused damages of $927,500 plus costs and attorney's fees. ECF No. 1 at 5-6. On July 15, 2016, Unibest filed an Amended Complaint, alleging Winfield "breached the Agreement by: (1) failing to pay the full amount owed under the Liquidated Damages Clause; (2) failing to develop a marketing strategy for sales of the Products to the Market; and (3) failing to use commercially reasonable efforts to sell and promote the Products to the Market." ECF No. 3 at 5-6. Its alleged damages remained the same. *See* ECF No. 3 at 6. Winfield filed an answer and demand for jury trial on August 9, 2016. *See* ECF No. 5. Winfield filed the present Motion for Summary Judgment on September 5, 2017. *See* ECF No. 25.

## III.  **STANDARD OF REVIEW**

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact. *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samiengo, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016). The district court's function at summary judgment is "not to weigh evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

**IV.  ANALYSIS**

Winfield asks the Court to grant summary judgment in its favor. It relies on two primary arguments: (1) that Unibest's claim for liquidated damages fails as a matter of law; and (2) that Unibest's other damages are barred by Minnesota law and the plain language of the Agreement. *See* ECF No. 25 at 3, 12, 16. The Court will address each argument in turn.

**A.  Liquidated damages**

Pursuant to Section 27 of the Agreement and Section 5 of the Agreemnt, this dispute is governed by Minnesota law. *See* Agreement at 12; Amendment at 4; *see also* ECF No. 25 at 5; ECF No. 38 at 8. Under Minnesota law, the construction and effect of a contract's terms presents a question of law. *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). The primary goal of contract interpretation is to determine and enforce the intent of the parties. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979). "If a contract is unambiguous, then the language must be given its plain and ordinary meaning and will be enforced by the courts even if the results are harsh." *Bank Midwest, Minnesota, Iowa, N.A. v. Lipetzky*, 674 N.W.2d 176, 179 (Minn. 2004) (internal quotations

omitted); *but see Brookfield*, 584 N.W.2d at 394 (courts "will not construe the terms so as to lead to a harsh and absurd result").

The meaning of a term is to be determined within the context of the document as a whole and not in isolation. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn. 1979). Accordingly, courts are required to harmonize all provisions of a contract and to avoid a construction that would render one or more provisions meaningless. *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995).

The liquidated damages clause is contained in Section 2(c) of the Agreement. The Agreement provides that the clause would be triggered "in the event that [Winfield] fails to purchase the applicable Minimum Annual Purchase Quantity in accordance with Section 2(b)(ii)." If the liquidated damages clause was triggered, Unibest had two remedies. First, Unibest had the right to revoke Winfield's exclusive distribution rights. Second, it could be entitled to liquidated damages, calculated in the following manner:

> (i) Distributor shall promptly pay Manufacturer, as liquidated damages and not as penalty, an amount equal to the product of (x) the sum of (A) the applicable Minimum Annual Purchase Quantity for such calendar year, minus (B) the number of Product units actually purchased by Manufacturer in such calendar year. . . multiplied by (y) the unit price of the lowest priced Product offered to Distributor for such calendar year, minus (z) the amount, if any, already prepaid for the Products by Distributor in such a calendar year pursuant to Section 2(b).

Agreement at 4.

Unibest initially contended that Winfield's failure to timely pay the First Product Payment, due February 15, 2016, triggered the

liquidated damages clause. *See* ECF No. 1 at 5. However, Unibest now focuses its liquidated damages claim on the contention that Winfield's failure to make the Second Product Payment on October 1, 2016, constituted a failure to purchase the MAPQ "in accordance with Section 2(b)(ii)," thus triggering the clause. ECF No. 38 at 3, 6. Unibest argues it is entitled to recover $683,750 in liquidated damages as a result of both alleged breaches of the Agreement. ECF No. 38 at 9.

### 1.    2016 First Product Payment

As stated above, Unibest originally contended that it was Winfield's late payment of the First Product Payment – due on February 15, 2016, but not paid until April 1 – that entitled it to liquidated damages. *See* ECF No. 1 at 5. Winfield responds that the Agreement provides a different, express penalty for late payments, and accordingly, the liquidated damages clause is not controlling.

Section 7 of the Agreement, in fact, does provide a remedy for late payments: "[a]ny invoiced amount not paid when due shall be subject to a service charge equal to the lesser of one percent (1%) per month or the maximum rate permitted by law from the due date until paid." The parties' conduct illustrates the operation of this clause. After Winfield failed to pay an invoice due on September 29, 2015, Unibest charged Winfield $13,035.45 of monthly "service charges," calculated from the invoice due date through January 27, 2016, the time the invoice was actually paid. This conduct is fully in compliance with Section 7 of the Agreement and demonstrates the clarity of the clause's language.

1      Moreover, the Court is to harmonize all provisions of the

2  Agreement and avoid a construction that would render one or more

3  provisions meaningless. *See Current Tech.*, 530 N.W.2d at 543. Holding

4  that a late payment of the First Product Payment triggered the

5  liquidated damages clause would render Section 7 of the Agreement

6  meaningless. Accordingly, viewing both the liquidated damages and late

7  payment clauses of the Agreement in harmony, Winfield's late payment

8  of the First Product Payment did not trigger the liquidated damages

9  clause.

10      2.   <u>2016 Second Product Payment</u>

11      Unibest's argument regarding the 2016 Second Product Payment

12  rests on two premises: (1) that Winfield's purchase obligation accrued

13  in its entirety on January 1, 2016; and (2) that the obligation

14  survived the Agreement's termination. The plain language of the

15  Agreement contradicts both premises.

16      a.   <u>*Plain language*</u>

17      Unibest admits that "the Agreement does not explicitly state

18  when during the course of 2016 this obligation arose . . . ." ECF

19  No. 38 at 4. Nevertheless, it argues that a number of the Agreement's

20  provisions suggest Winfield's purchase obligation vested in full on

21  January 1 of each calendar year. *Id*. After a thorough review of the

22  Agreement and Amendment, the Court can find no language supporting

23  this interpretative theory; there is only language contradicting it.

24

25      For example, Unibest points to Section (2)(b)(ii) of the

26  Agreement, which required Winfield to "purchase a number of Product

units not less than the [MAPQ]" for "each calendar year." Unibest contends this reference to each "calendar year" indicates that Winfield's MAPQ vested on January 1 of each year. It is undeniably true that a calendar year begins on January 1. However, the context of Section (2)(b)(ii) indicates that the term simply defines the period in which Winfield was obligated to make the MAPQ – not that the MAPQ vested in its entirety on January 1 of each year.

As another example, Unibest points to Section 1(c) of the Amendment, which requires Winfield to "pay [Unibest] the First Product Payment and the Second Product Payment regardless of whether [Winfield] submitted purchase orders(s) for such Product units." Amendment at 2. Unibest argues that this language "shows that the purchase quantity requirement vested automatically at the commencement of the year." ECF No. 38 at 5. However, Unibest's argument distorts the language of the Agreement outside of its plain meaning. This portion of the Amendment stands for nothing more than what it says: that Winfield was obligated to make product payments on the schedule outlined in the Agreement, whether or not it submitted a purchase order.

Further, Winfield correctly points out that under Unibest's interpretation of the Agreement, Winfield could have sent notice of termination as late as November 1, 2016, and still be obligated to purchase the entire MAPQ for 2016. The absurdity of that scenario illustrates that the parties could not have intended the MAPQ – in its entirety – vest on January 1 of each year. *See Lakeland Tool & Eng'g,*

*Inc. v. Thermo-Serv., Inc.*, 916 F.2d 476, 481 (8th Cir. 1990) ("Contracts are to be construed as to avoid absurdity.").

Rather than vesting on January 1 of each year, the plain language of the Agreement and Amendment supports the following interpretation. Although Winfield was obligated to purchase the MAPQ each year, each year's MAPQ obligation vested in two installments: Winfield was to purchase at least 50% of the MAPQ on February 15 of each year and the remainder of the MAPQ on October 1 of each year.[2] Until those dates came, Winfield had no obligation to purchase any products from Unibest. Of course Winfield had the option to purchase the entire MAPQ on January 1, 2016, but it was not obligated to do so.

As evidence of this, both the Agreement and the Amendment repeatedly reference Winfield's ability to "pre-pay" for Products subject to the MAPQ.[3] If Winfield was obligated on January 1, 2016, to

---

[2] *See* Amendment at 2.

> (A) no later than February 15th of each calendar year during the Term, Distributor shall pay Manufacturer an amount equal to the sum of (i) 50% of the product of (x) the applicable [MAPQ] multiplied by (y) the unit price of the lowest priced Product offered to Distributor for such year. . ., minus (ii) the amount already paid to Manufacturer by Distributor for Product units purchased during such calendar year (the "First Product Payment"); and (B) no later than October 1st of each calendar year during the Term, Distributor shall pay Manufacturer an amount equal to the sum of (i) 50% of the product of (x) the applicable [MAPQ] multiplied by (y) the Lowest Product Price, minus (ii) the amount, if any, already paid to Manufacturer by Distributor for Product units purchased during such calendar year other than the Frist Product Payment (the "Second Product Payment").

[3] *See* Agreement at 3, 4, 6 ("Each invoice will specify the amount that Distributor has *prepaid* for the Product units. . . .") ("Distributor may use "*pre-purchased* Capsules and Cylinders. . . ", (Distributor shall pay liquidated damages, calculated in part by amount "already *prepaid* for the Products by Distributor in [a] calendar year"), (in event of termination, Manufacturer must refund "any and all *pre-paid* amounts") (emphasis added); *see also* Amendment at 2 (Manufacturer will provide invoices specifying the

purchase the entire MAPQ, as Unibest suggests, the "pre-payments" referenced would not be "pre-" anything — they would simply be "payments" for an existing obligation. Instead, the language of the Agreement and Amendment reference "pre-payments" because the payments *did not become due* until the enumerated dates of the First and Second Product Payments (February 15 and October 1 of each calendar year).

b.  *Termination clause*

Even if the MAPQ did vest in its entirety on January 1, 2016, the Agreement's termination clause bars Unibest from recovering liquidated damages for Winfield's failure to make the Second Product Payment. The clause reads:

> c.  Either party may terminate this Agreement at any time for any reason upon sixty (60) days prior written notice to the other party. In the event [Unibest] terminates this Agreement in accordance with this Section 4(a), [Unibest] shall refund to [Winfield] any and all pre-paid amounts attributable to Product not yet received by Distributor. In the event [Winfield] terminates this Agreement in accordance with this Section 4(a), [Unibest] shall have no obligation to refund [Winfield] any amounts prepaid by Distributor.

Agreement at 6.

The plain language of the above clause unambiguously empowers either party to terminate the Agreement at will at any time.[4] Further, it directs the disposal of any pending transactions between the parties at the time of termination: if Unibest terminated, it was to

amount that Distributor has "prepaid for the Product units covered by such invoice").

[4] In cases involving similar contract language, Minnesota courts have come to the same conclusion. *See, e.g., Banbury v. Omnitrition Intern., Inc.*, 533 N.W.2d 876, 880 (Minn. Ct. App. 1995).

refund any pre-paid amounts for product not yet received by Winfield; and if Winfield terminated, it agreed to forfeit any amounts it had pre-paid to Unibest. This express settlement of pending transactions indicates the parties' intent that all obligations — aside from those expressly included in the survival clause — would cease upon the Agreement's effective termination.

Further, the Agreement's survival clause indicates the parties did not intend for any purchase obligations to survive termination. The survival clause contains a list of contract provisions that the parties expressly agreed would survive termination.[5] Absent from the list is Section 2 of the Agreement — the original clause obligating Winfield to purchase the annual MAPQ. The parties also negotiated and executed an Amendment to the Agreement. *See generally* Amendment. The Amendment does not amend the survival clause to include Section 1(c) of the Amendment — the section replacing Section 2 of the Agreement. These absences are telling. If the parties intended Winfield's MAPQ obligations to survive termination of the contract, they would have included the payment provision in the survival clause.

Winfield sent notice of termination on April 1, 2016. *See* ECF No. 28, Exhibit P. Unibest has not disputed the notice's validity, and the Court can find no facial errors that would render the notice ineffective. Section 19 of the Agreement provides that all notices are

---

[5] The survival clause is contained in Section 21 of the Agreement:

> <u>Survival</u>. Sections 7 through 11, 15, 17, through 28, and any other provision which by its sense and context is appropriate, shall survive the termination of this Agreement by either party for any reason.

Agreement at 12.

deemed to be effective three days after mailing. *See* Agreement at 11. Thus, the Agreement was effectively terminated 63 days later, on June 3, 2016. So, regardless of when they vested, Winfield's MAPQ obligations ended on June 3, 2016.

Unibest argues that Winfield remained obligated to purchase products from Unibest on October 1, 2016 — 6 months from its notice of termination. Not only is this result contradicted by the plain language of the termination and survival clauses, it would be inequitable to Winfield.

### d. *Minnesota law*

In addition, Unibest's claim for liquidated damages is barred by Minnesota law. Generally, Minnesota law provides that where a contract is terminable at will, termination bars recovery for damages incurred after the date of termination. In *Ag-Chem Equipment Co., Inc. v. Hahn, Inc.*, 480 F.2d 482, 492 (8th Cir. 1973), the Court of Appeals for the Eighth Circuit affirmed the district court's holding that a distributor could not recover from a manufacturer damages that were incurred post-termination. Even though the manufacturer had breached the contract, the distribution contract in question was terminable at will by either party. The court noted that "Minnesota law does not prohibit termination by one who has already breached the contract. As a consequence, damages incurred after termination . . . were not recoverable. . . ." *Id.* (citing *Western Oil & Fuel Co. v. Kemp*, 245 F.2d 633 (8th Cir. 1957)).

//

/

In a similar case, the Minnesota Supreme Court explained the crux of the issue was whether the agreement in question was terminable at will. In *Benson Coop. Creamery Ass'n v. First District Ass'n*, 151 N.W.2d 422 (Minn. 1967), a dairy cooperative made an oral contract to process milk and deliver the resultant products — butter, skim milk, and dried milk — to Land O'Lakes and a subsidiary cooperative. After approximately nine years of deliveries, on March 7, 1963, the subsidiary informed the dairy cooperative that it was terminating the contract. *Id.* at 424-25. The dairy cooperative sued, seeking injunctive relief and damages for milk deliveries from March 27, 1963, to June 14, 1963.

The trial court granted the subsidiary's motion for summary judgment on damages and held that because contracts in Minnesota are presumptively terminable at will, the dairy cooperative could not recover for deliveries that were to be made post-termination. *Id.* at 425. On appeal, the Minnesota Supreme Court Court reversed the trial court's entry of summary judgment on damages because whether the contract was terminable was a "crucial issue of fact that must be determined by trial." *Id.* at 427. The Court explained,

> [i]f the evidence as finally adduced leads to a sustainable determination that this contract was terminable at the will of the Association upon reasonable notice without cause, there would be no cause of action for damages, at least not for failure to pick up Benson's milk after March 27, 1963.

*Id.* Here, as discussed above, the termination clause plainly entitled either party to terminate the Agreement at any time and for any reason. In other words, it was terminable "at will." Accordingly,

Minnesota law arguably bars recovery of *all* damages incurred by Unibest after the Agreement was terminated. *See Ag-Chem*, 480 F.2d at 492; *see also Benson*, N.W.2d at 427 (Minn. 1967). In any event, Minnesota law bars Unibest's claim for liquidated damages. Whether Winfield had breached the Agreement at the time of termination is inapposite because Minnesota law does not prohibit a breaching party from terminating a contract. *See Ag-Chem*, 480 F.2d at 492.

For the reasons outlined above, neither the plain language of the Agreement nor Minnesota law as applied to the facts before the Court permit Unibest to recover liquidated damages against Winfield. Accordingly, Winfield's motion for summary judgment is granted insofar as it relates to Unibest's claim for liquidated damages.

### 3. Anticipatory repudiation

Unibest also argues that Winfield's termination of the Agreement on April 1, 2016, and Mr. Grenzow's February 12, 2016 email[6] constituted an anticipatory repudiation of the Agreement, which entitled Unibest to "either elect to sue immediately or wait until the time when performance is due."[7] ECF No. 38 at 10 (quoting *Space Ctr., Inc. v. 451 Corp.*, 290 N.W.2d 443, 451 (Minn. 1980). Unibest explains

---

[6] The relevant portion of the email reads:

> Also, per our last conversation[,] WinField will not be taking anymore [sic] physical product under the contract. We have excess inventory that we will be utilizing for research purposes in 2016 season.
>
> Look forward to catching up,
>
> Tyler Grenzow
> Marketing Manager, WinField

[7] Notably, this argument supports the Court's conclusion that Winfield's obligation to make the Second Product Payment did vest not until October 1, 2016.

that it "elected to sue immediately rather than wait on Winfield's failure to pay the Second Invoice . . . ." *Id*.

In Minnesota, an anticipatory repudiation first requires "an unqualified renunciation or repudiation of the contract. A mere refusal, not of that character, will not obviate the necessity of a tender." *Space Ctr.*, 298 N.W.2d at 450. Mr. Grenzow's email does not meet this threshold requirement. The preface "[a]lso, per our last conversation," indicates Mr. Grenzow qualified Winfield's intent to withdraw from the Agreement on the premise that Unibest did not disagree.

In a sense, Winfield's April 1, 2016 notice of termination was an anticipatory repudiation, in that it stated Winfield's intent to no longer perform its contractual obligations. *See* ECF No. 28, Exhibit P. However, as discussed above, Winfield's termination – effective June 3, 2016, relieved it of all its contractual obligations. Moreover, Minnesota law still bars Unibest's claim for liquidated damages for Winfield's failure to make the Second Product Payment.

4. <u>Enforceability of liquidated damages</u>

Because the Court has granted Winfield's motion for summary judgment as to Unibest's liquidated damages claim, it need not address whether the damages would be enforceable under Minnesota law.

**B.    Other damages**

Unibest also alleges non-liquidated damages under a variety of legal theories, which the Court will address in turn.

//

/

1                     1.    <u>Lost profits</u>

2        Unibest's expert report, ECF No. 27, Exhibit C, asserts that

3   Unibest also suffered "lost profits" of up to $2,841,300. ECF No. 2,

4   Exhibit C at 12. These damages appear to consist of the 2016 Second

5   Product Payment and the entirety of Winfield's MAPQ obligations for

6   2017 and 2018. *See id*. at 13, 15. Above, the Court held that the plain

7   language of the Agreement and Minnesota law bar Unibest's claim for

8   liquidated damages related to the 2016 Second Product Payment. For the

9   same reasons, the Court grants Defendant's motion as to Unibest's 2017

10  and 2018 "lost profits."

11       As is common in contract cases, the parties dispute the nature

12  of these damages. As noted above, Unibest's expert referred to the

13  damages as "lost profits." *Id*. In its response, Unibest appeared to

14  back away from this characterization.[8] Winfield, on the other hand,

15  embraces the term "lost profits" and contends that this claim

16  constitutes consequential damages, which are barred by the Agreement's

17  broad limitation of liability clause.[9] *See* ECF No. 25 at 12–13.

18       It is certainly true that Unibest suffered a significant loss

19  when Winfield terminated the Agreement; it would no longer receive the

20  [8] Unibest contends that Winfield's arguments regarding lost profits "are
    misplaced because (other than the liquidated damages discussed above),
21  Unibest is only seeking direct damages incurred prior to termination." *See*
    ECF No. 38 at 13.
22  [9] The limitation of liability clause is contained in Section 10 of the
    Agreement and reads:

23
         In no event shall either party be liable to the other for costs
24       of procurement of substitute goods or any indirect, incidental,
         punitive, or consequential damages (including but not limited to
25       loss of revenue or profits) arising from or caused, directly or
         indirectly by such party's failure to perform under this
26       agreement, even if advised or aware of the possibility of such
         damages.

six-figure Second Product Payment in 2016, and it would not receive any payments at all from Winfield in 2017 and 2018. So although these damages do not constitute "lost profits" as they are often thought of — as resulting from business with third parties — to a certain extent, they are Unibest's lost profits as a result of Winfield's alleged breach and subsequent termination of the Agreement.[10]

That said, the alleged damages are clearly direct. These Product Payments are expressly mentioned in the Agreement and Amendment and arise directly from them. *See* Agreement at 3; Amendment at 2. For this reason, Unibest's claim for lost profits is for direct, rather than consequential, damages.[11] And because the alleged damages are direct, the limitation of liability clause, which expressly bars "indirect, incidental, punitive, or consequential damages," does not bar Unibest's claim.

Nonetheless, the damages are barred by the plain language of the Agreement and Minnesota law. Just as with the Second Product Payment, Winfield was not obligated to meet the 2017 and 2018 MAPQs until the product payment dates enumerated in the Amendment. *See* Amendment at 2. Winfield's termination of the Agreement, effective June 3, 2016, freed it from all of its obligations under the Agreement, including those in 2017 and 2018. Unibest incurred or will incur all of its alleged

---

[10] Black's Law Dictionary and the Uniform Commercial Code define "lost profits" broadly: "[a] measure of damages that allows a seller to collect the profits that would have been made on the sale if the buyer had not breached. U.C.C. § 2-708(2)." Notably, the definition does not limit a plaintiff to claiming only lost profits from a third party.

[11] *See Kleven v. Geigy Agric. Chemicals*, 303 Minn. 320, 324, 227 N.W.2d 566, 569 (Minn. 1975) (direct damages "arise out of the breach itself," while consequential damages "do not arise directly . . . from the breach of the contract itself, but are those which are the consequences of special circumstances known to . . . the parties when the contract was made").

damages for lost profits after Winfield terminated the Agreement. Therefore, Unibest's claim for lost profits is barred by the law of Minnesota; and as to the lost profits, Winfield's motion is granted. *See Ag-Chem*, 480 F.2d at 492 ("As a consequence, damages incurred after termination, including lost profits, were not recoverable.").

2.  "Go-to-market strategy"

Unibest also alleges it suffered damages caused by Winfield's failure to "develop a marketing strategy for sales of the Products to the Market" and failure to "use commercially reasonable efforts to sell and promote the Products to the Market." *See* ECF No. 3 at 6, 9–10; ECF No. 38 at 15. Unibest claims "the estimated cost of obtaining replacement services for the ones Winfield failed to provide is $975,000 . . . ." ECF No. 41 at 41. Broken out, this amount consists of "$401,080 to attend trade shows to market the Products," "$25,100 to create marketing materials," "$250,200 to develop new partnerships," and "$300,000 to replace data and perform new research that should have been done under the Agreement." ECF No. 41 at 41–42. Unibest also claims an additional $800,208 that Unibest has "already incurred . . . to develop the Soil Analytics Database that Winfield should have developed under the Agreement." ECF No. 41 at 42.

a.  *Research and development*

Unibest asserts that Section (2)(a) of the Agreement, which obligated Winfield to "develop a marketing strategy for sales of the Products to the Market," impliedly obligated Winfield to conduct research and development on product performance and to develop a "Soil Analytics Database," which would purportedly be "used for marketing."

*See* ECF No. 38 at 14–15; ECF No. 41 at 16, 41–42. After all, Unibest argues, "[a] contract to build a house does not have to describe every single nail to be hammered." ECF No. 38 at 15.

However, Unibest's interpretation of the terms "marketing strategy" and "go-to-market strategy" stretches the Agreement's plain language beyond its breaking point. A contract to build a house need not describe every nail, but it must at least mention the house. In the same way, a contract establishing an affirmative duty to conduct more than a million dollars of research and database development must at least mention the research and the database.[12] The Court acknowledges that a marketing strategy can take a variety of forms, but the language of the Agreement simply does not support Unibest's claim.

Curiously, an example of the requisite language to establish such a duty is present in a contract that Unibest signed with Midwest Soil Management in 2010, well before the Agreement with Winfield was executed. *See* ECF No. 50, Exhibit B, C; *see also* Agreement at 1. In that contract, the parties agreed to following:

> Midwest Soil is committed to funding and performing a study that involves the use of UNIBEST resin technology. The study shall be performed over a maximum of a 5 year period spanning 2010 through 2014 and shall encompass an area of at least 10,000 acres with standard sampling frequency. Midwest Soil shall reimburse UNIBEST its cost for the resin product and laboratory analysis as supplied for the study at

---

[12] The terms "research" and "database" each appear only once in the Agreement. "Research" is mentioned in the context of describing the Market in which the products were to be sold. *See* Agreement at 1. "Database" appears only in reference to services that Unibest was obligated to perform in return for Winfield's payment of a $60,000 Manufacturer Services Fee. *See* Agreement at 5.

> the rate of $15.00 per sample during the first 3 years. After year 3, the parties agree to a thorough business review and access all aspects to determine if the remaining 2 years of sampling is necessary for project success.

ECF No. 50, Exhibit B at 2. Because there is no such language in its Agreement with Winfield, Unibest's claim that a "marketing strategy" encompasses research and development is unpersuasive.

Unibest further supports its claim by arguing that the parties entered into the Agreement with the understanding that Winfield would conduct research and build the soil database, a claim Winfield vehemently denies. *See* ECF No. 27 at 16–17. Where a contract term is unambiguous, the Court may not consider extrinsic evidence of the parties' intent. *See Brookfield Trade Ctr.*, 584 N.W.2d at 392 n. 1. As discussed above, the terms "marketing strategy" and "go-to-market strategy" simply do not encompass the research and development claimed by Unibest. The terms, as a matter of law, are unambiguous in this regard. Accordingly, the Court may not consider any evidence of the parties' intent and declines to address this argument.[13] Winfield's motion for summary judgment is granted insofar as it relates to

---

[13] Even if the terms were ambiguous, the record contains insufficient evidence to establish a genuine dispute of material fact as to whether the parties intended the terms to encompass research and development. In fact, the record indicates that they clearly did not; Unibest CEO Mark Riess admitted in a July 14, 2014 email to Midwest Soil Management that "*Winfield has no involvement in the data side since the agreement only applies to hardware*. We are free to seek partners on the data and modeling side as we see fit with no immediate impact to the agreement . . . ." ECF No. 50, Exhibit E (emphasis added). Other evidence in the record leads the Court to the same conclusion. *See* ECF No. 50, Exhibits C, D, F. To whatever degree Winfield conducted research and development of Unibest's products (e.g. in answer plots) or attempt to create a product database, it did so out of a good faith desire to market Unibest products, not out of any obligation under the Agreement.

Unibest's claims of damages for research and development and the Soil Analysis Database.

    b. *Failure to market*

  Setting aside the $300,000 in alleged damages for additional research and the $800,208 for development of the Soil Analytics Database, Unibest claims approximately $675,000 in alleged damages due to Winfield's failure to market the products. *See* ECF No. 41 at 41–42.

  Viewing all facts in the light most favorable to Unibest, a genuine dispute of material fact exists as to its damages arising directly out of Winfield's alleged breach of its contractual duty to "work with Unibest to develop a marketing strategy for sales of the Products to the Market." *See* Agreement at 2. Accordingly, Winfield's motion for summary judgment is denied insofar as it relates to Unibest's claim for damages – aside from research and development – it suffered directly as a result of Winfield's alleged failure to market the products. *See* Fed. R. Civ. P. 56(a).

  Accordingly, **IT IS HEREBY ORDERED**:

1. As set forth above, Defendant Winfield Solutions' Motion for Summary Judgment, **ECF No. 25**, is **GRANTED IN PART AND DENIED IN PART.**

2. The parties are directed to **MEET AND CONFER** regarding a proposed case schedule that will align with one of the following trial dates: April 16, 2018; April 30, 2018; or June 25, 2018.

3. **By no later than January 8, 2018, the parties shall jointly FILE a notice** that indicates their preferred trial date as

well as a proposed amended case schedule, including the following deadlines:

| | |
|---|---|
| Witness and Exhibit lists:<br>    Lists filed and served:<br>    Objections filed and served: | |
| Deposition Designations:<br>    Designated Transcripts served:<br>    Cross-Designations served:<br>    Objections filed and served: | |
| All motions in limine filed | |
| Joint Proposed Pretrial Order filed and emailed to the Court | |
| Confer with Courtroom Deputy regarding JERS | **(At least 1 Week Before Pretrial Conference)** |
| **PRETRIAL CONFERENCE** | **Richland** |
| Mediation, if any, must be completed by | **(At least 90 Days Before Trial)** |
| Trial briefs, jury instructions, verdict forms, requested voir dire, and list of exhibits admitted without objection, filed and emailed to the Court | |
| **FINAL PRETRIAL CONFERENCE** | **(9:00 a.m. First day of trial)** |
| **JURY TRIAL** | **April 16, 2018;<br>April 30, 2018; or<br>June 25, 2018** |

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this __18th__ day of December 2017.

s/Edward F. Shea
_____
EDWARD F. SHEA
Senior United States District Judge
